PER CURIAM.
This cause is before us on direct appeal from a final judgment of the Circuit Court of Duval County, validating and confirming the issuance of $1 million Industrial Development Revenue Bonds of the Jacksonville Port Authority, to be issued for the purpose of financing the acquisition and construction of an industrial plant for the bottling, storing, shipping and distribution of beverage products. We have jurisdiction pursuant to Fla.Const., Article V, § 4(2), F.S.A. as a bond validation proceeding.
In 1968, in conjunction with the consolidation of the municipal and county governments in Duval County, Jacksonville Port Authority [1] acquired ownership of and responsibility for Imeson Airport, located on a tributary of the St. Johns River, and active at that time as a general aviation facility. As part of the transfer agreement, the Port Authority was pledged to shut down airport operations at Imeson as soon as practicable, and to dispose of the property, preferably by sale to a private party. Both these obligations have since been performed: the Airport was closed in 1969, and in 1970, a buyer was found who agreed to purchase the entire holding for the purpose of establishing “Imeson International Industrial Park”. The sale was completed in May, 1971, and the development of the property into an industrial park is currently underway.
To facilitate the industrial growth of the park, the Port Authority on January 26, 1972, adopted a resolution providing for the issuance of Industrial Development Revenue Bonds pursuant to Chapter 159, Part II, Florida Statutes, to finance the acquisition and construction of a wine and beverage processing plant on five acres of Imeson land. After construction, the Port Authority agreed to sell the project to C & D Realty Corp. for subsequent leasing to and operation by National Distributing Company. Atlantic National Bank of Jacksonvile was committed to purchase the $1 million dollar bond issue called for by the resolution.
The resolution declares that the bonds sought to be validated shall bear interest at the rate of seven per centum (7%) per an-num. The principle and interest on the proposed bonds is to be paid exclusively from the proceeds derived from the sale of the project to C & D Realty Corp. It is further provided that the bonds shall not constitute general obligations of indebtedness of the Authority as “bonds” within the meaning of Article VII, Section 12 of the 1968 Florida Constitution, but shall be payable solely from the revenues generated from the sale of the project.
As required by Fla.Stat. § 159.29, F.S.A., the resolution also determined: (1) that the project would make a significant contribution to the economic growth of the community, would provide gainful employment and would serve a public purpose by advancing the economic prosperity and general welfare of the State and its people; (2) that both C & D Realty Corp., and its *3 proposed lessee, National Distributing Company, were financially responsible and fully capable and willing to fulfill their obligations under the' agreement of sale and lease; (3) that adequate provision would be made for the operation, repair and maintenance of the project at the expense of C & D Realty Corp.; and (4) that the consolidated City of Jacksonville would be able to cope satisfactorily with the impact of the project and would be able to provide the public services and facilities necessary for the construction, operation, repair, and maintenance of the project. Fla.Stat. § 159.29, F.S.A. provides that the determination of the local agency as to compliance with the criteria of that section shall be final and conclusive. Accordingly, we deem the requirements of Fla.Stat. § 159.29, F.S.A. to have been satisfied by the Port Authority without the need for discussion. State v. County of Dade, 250 So. 2d 875 (Fla.1971).
Following hearing, the Circuit Court of Duval County, in its final judgment entered March 1, 1972, validated and confirmed the bond issue as being in compliance with Chapter 159, Part II, Florida Statutes. We affirm the judgment below.
Appellant asserts that the Jacksonville Port Authority is not a “local agency” empowered to issue Industrial Development Revenue Bonds within the purview of the Florida Industrial Development Financing Act. In effect, the Act authorizes local agencies as defined therein to issue revenue bonds for the purpose of funding projects permitted by the Act.[2] Fla.Stat. § 159.27 (4) defines “local agency” for purposes of the Act as follows:
“(4) ‘Local agency’ means any county or municipality existing or hereafter created pursuant to the laws of the state or any special district or other local governmental body existing or hereafter created pursuant to the laws of the state, the purpose for the creation of which could reasonably be interpreted to be consistent with the issuance of revenue bonds to finance the cost of projects within the meaning of this part.” (Emphasis supplied.)
A “project” within subsection (5) of the same section means:
“. . . any capital project comprising an industrial or manufacturing plant, including one or more buildings and other structures, whether or not on the same site or sites; any rehabilitation, improvement, renovation, or enlargement of, or any addition to, any buildings or structures for use as a factory, mill, processing plant, assembly plant, fabricating plant, industrial distribution center, repair, overhaul or service facility, test facility, and other facilities, including research and development, for manufacturing, processing, assembling, repairing, overhauling, servicing, testing, or handling of any products or commodities embraced in any industrial or manufacturing plant; and including also the sites thereof and other rights in land therefor whether improved or unimproved, machinery, equipment, site preparation and landscaping, and all appurtenances and facilities incidental thereto, such as warehouses, utilities, access roads, railroad sidings, truck docking and similar facilities, parking facilities, dockage, wharf-age, and other improvements necessary or convenient for any manufacturing or industrial plant.”
The Jacksonville Port Authority is a “local governmental body” which was “existing” on the effective date of the Industrial Development Financing Act. In our judgment, the beverage bottling and distribution plant sought to be financed by the Authority’s current bond issue is a “project” within the Financing Act. It may be classed as a “processing plant”, an “assembly plant” and/or as an “industrial distribution center” for products of the beverage industry.
*4 However, the Port Authority may be classed as a local agency empowered to issue bonds under the Act only if the purpose for its creation . . could reasonably be interpreted to be consistent with the issuance of revenue bonds to finance the cost of projects within the meaning of this part.” To determine whether this prerequisite is met, it is necessary to turn to the Charter of the Port Authority, together with relevant amendments thereto. The Charter is without a preamble delineating its express purpose. We turn instead, therefore, to the “powers” conferred on the Authority for enlightenment:
“Section 3. Powers. The Authority shall have the specific powers, in addition to other powers otherwise conferred:
“(1) To construct acquire, establish, improve, extend, enlarge, reconstruct, re-equip, maintain, repair and operate any project herein defined; . . (Emphasis supplied.)
Section 2(f) of the Charter, as amended by ¡Chapter 67-1533, Laws of Florida, describes the projects which may be undertaken by the Authority in the following language :
“(f) The word ‘project’ shall embrace any one or any combinations of two (2) or more of the following, to wit: facilities for the construction, manufacture, repair or maintenance of ships and other facilities, directly or indirectly related to the promotion and development of zvaterborne commerce, and other harbor, port, shipping and airport facilities of all kinds, including, but not limited to, harbors, channels, turning basins, anchorage areas, jetties, breakwaters, water ways, canals, locks, tidal basins, wharves, docks, piers, slips, bulkheads, public landings, runways, taxiways, warehouses, terminals, refrigerating and cold storage plants, railroads and air and motor terminals for passengers and freight, rolling stock, car ferries, boats, airplanes, conveyors and appliances of all kinds for the handling, storage, inspection and transportation of freight and the handling of passenger traffic, mail, express and freight, administration and service buildings, toll highways, tunnels, causeways, and bridges connected therewith or incident or auxiliary thereto, and may include all property, structures, facilities, rights, easements and franchises relating to any such project and deemed necessary or convenient for the acquisition, construction, purchase, or operation thereof.” (Emphasis supplied)
Thus, it appears that the essential purpose for the creation of the Port Authority was the promotion, directly or indirectly, of waterborne commerce. Such purpose is consistent with the issuance of revenue bonds to finance industrial or manufacturing projects within the meaning of Chapter 159. Accordingly, we hold that the Jacksonville Port Authority is a “local agency” empowered to issue industrial development revenue bonds pursuant to Chapter 159, Florida Statutes.
However, this finding does not permit the Port Authority to issue bonds for purposes other than those permitted by its Charter. Is the construction of a beverage processing plant consistent with the purpose of the Port Authority to promote, directly or indirectly, waterborne commerce? In this case, we conclude that it is. Andrew Carlos, treasurer of the National Distributing Company, was called to testify before the Circuit Court on this aspect of the case. From his testimony, it appears that the 'processing plant will engage in three separate but related operations: (1) it will bottle and distribute domestic wines shipped in bulk from various parts of the United States to the Florida and Georgia marketing areas: (2) it will store and distribute wines imported in bottle from France, Spain and Italy; and (3) it will store and distribute bottled spirituous liquors, both domestic and imported.
The bulk domestic wine operation, con-cededly, will not utilize the Port of Jacksonville : these wines are to be shipped *5 overland to Florida either by rail or truck, primarily from California and New York. There was some discussion in the record as to the availability of tanker ships for the transportation of bulk domestic wines, but the witness Carlos indicated that National had no plans to employ this method of transport for its domestic wines.
However, the witness also testified that all, or nearly all, of the imported wines distributed by the company would be transported by ship into the Port of Jacksonville. An example is the following exchange :
“Q. Now, when you import wines and liquors, how do they get to you or how do you propose they will get to you in Jacksonville?
“A. Primarily they come in through the Port of Jacksonville.
“Q. They will come by ship?
“A. By ship through the Port of Jacksonville.
“Q. Through the Port of Jacksonville?
“A. Yes, sir.”
And further on:
“Q. So, you actually won’t be importing anything that will come from, say France into Jacksonville by way of ship, will you?
“A. Oh, yes.
“Q. What will that be, sir ?
“A. Wines, imported wines, French wines, Spanish wines, Italian wines.”
We also mention two noteworthy observations of the witness concerning the Miami and Georgia operations of the National Distributing Company. First:
“Q. . . . And the port — Everglades port or harbor [in Fort Lau-derdale, just north of Miami] is a receiving point for those wines down there?
Some do come through Jacksonville because of the facilities afforded here. A.
“Q. I see.
“A. The containers, for instance, is a big thing here as against down there.”
And the following comments:
“Q. One last question, Mr. Carlos, you are at this time in behalf of your Miami operation receiving imported wines through the Jacksonville port?
“A. I believe so; yes, sir.
“Q. Now, so strongly do you believe that — it’s important to me and I don’t mean to pick at words, but you say you believe so and that movement could go—
“A. We’d be receiving goods through the Jacksonville port. Let’s go back a year ago. I would say the majority of our wines, imported wines, were coming in through Jacksonville. What the percentages are today, I do not know. I know we are receiving all our wines for our Jacksonville operation within Jacksonville now. For instance, in Georgia, I import wines and whiskies, Scotches and what-have-you, I hate to say this because I am — I am a Georgian, you might say, but the Port of Jacksonville affords me better facilities and I bring my stuff in through the Port of Jacksonville.”
In our view these latter statements are of consequence because they underline the point that the Port of Jacksonville, which is equipped, among other things, to handle container ship operations, has been a significant factor in the concerns of the National Distributing Company, even prior to the opening of a processing plant in Jacksonville. So efficient, apparently, is the port, that National prefers to use it, where *6 possible, in both its Georgia and Miami operations, although this necessitates extra overland hauling. Awareness of this background lends additional credence to the witness’ testimony that the company intends to fully utilize the port in its imported wine operation in Jacksonville.[3]
Accordingly, in our judgment there was sufficient evidence before the trial court from which it could conclude that substantial quantities of wines and some liquors will be imported by ship through the Port of Jacksonville to be distributed throughout the Florida and Georgia marketing areas. It is, moreover, highly probable that the existence of a distribution plant at a site close to the St. John’s River will encourage shippers and importers of wines and spirits to do increased volumes of business through the Port, provided National’s venture is financially successful, which we have no reason to doubt. Consequently, we are persuaded that this particular project will promote waterborne commerce, and is therefore an authorized project under the Charter of the Jacksonville Port Authority.
After careful consideration of the arguments, briefs and record in this cause, we are satisfied that appellees have complied in all respects with Fla.Const., Article VII, Section 10(c), with Chapter 159, Part II, Florida Statutes, and with the Charter of the Jacksonville Port Authority. Therefore, the judgment of the Circuit Court is affirmed.
It is so ordered.
ERVIN, CARLTON, ADKINS and McCAIN, J J., concur.
ROBERTS, C. J., dissents.
DEKLE, J., dissents with opinion.
BOYD, J., dissents and agrees with DEKLE, J.

. The Jacksonville Port Authority is a Florida corporation created by special act of the Legislature in 1963. See Chapter 63-1447, Laws of Florida, commonly known as the “Charter” of the Authority, and subsequent amendments thereto, particularly Chapter 67-1533, Laws of Florida.

. Fla.Stat. § 159.28(7).

. A discrepancy in the record should be cleared up at this point. Near the close of the proceedings the witness Carlos was asked:
“Q. Just — Mr. Carlos, with reference to the answers, your answers to Judge Winegeart’s questions, do you at this time plan to use a tanker to bring in imported wines”
“A. No, sir.”
This statement appears clear enough on its face, but directly conflicts with the preceding testimony by the same witness that the Port of Jacksonville would be the receiving point for wines imported by ship from Europe. On closer inspection, the conflict resolves itself. The questions posed to the witness by Judge Winegeart exclusively concerned the method of shipment of bulk domestic wines coming from California and New York. As to those wines, the witness admitted that land transportation was to be utilized — tank cars and trucks. It appears, therefore, that when the witness was later asked about plans to use a tanker, coupled with a reference to Judge Winegeart’s earlier questions, he understood the question to refer to bulk wines coming from various parts of the United States, notwithstanding the reference to imported wines. Thus, we do not view this testimony, taken in context, as persuasive with regard to utilization of the Port of Jacksonville in the company’s imported wine operation.